**UNITED STATES of America, Appellee,**

v.

**Joseph DOUGHERTY, Appellant.**

**No. 86–1642.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 11, 1986.

Decided Jan. 28, 1987.

---

Duane L. Nelson, Lincoln, Neb., for appellant.

Steven A. Russell, Asst. U.S. Atty., Lincoln, Neb., for appellee.

Before JOHN R. GIBSON and FAGG, Circuit Judges, and HANSON,* Senior District Judge.

HANSON, Senior District Judge.

Joseph Dougherty brings a number of issues before the court, appealing his conviction on two counts of violation of 7 U.S.C. § 2024(b), the unlawful acquisition of food stamps. For the reasons stated below, we affirm the decision of the district court.[1]

## I.

In March 1985, while working as an undercover agent involved in the enforcement of food stamp laws, Special Agent Joseph F. Meusberger met Arnold Kehm. Using the identity of "Joe Scott," Meusberger told Kehm that if he should meet anyone who was interested in buying food stamp coupons that he could contact him.

In May of 1985, Meusberger learned Kehm had found someone who wanted to purchase food stamps. On May 14, 1985, Meusberger and Kehm went to the Mountains Bar in Lincoln, Nebraska and met with Joseph Dougherty. During that meeting Meusberger informed them that he had a girl friend who worked in the food stamp office and could obtain as many food stamps as he wanted. Dougherty and Kehm agreed to purchase food stamps.

On May 15, 1985, Meusberger again met with Dougherty and Kehm at the Mountains Bar, with Dougherty purchasing $970 in food stamps in exchange for $485 in cash. At this time, also, Meusberger gave Dougherty a telephone number so that Dougherty could reach him if he ever wanted to purchase additional food stamps.

No further contact was made by the secret service with Dougherty. On July 29, 1985, Dougherty called the undercover phone number at the office of the Secret Service, indicating to Special Agent Kelly Ward that he wanted to purchase additional food stamps. As a result of that contact, a meeting was scheduled so that Holger Beckman, another Secret Service Agent, could meet Dougherty on July 31, 1985. At that time Dougherty purchased $950 in food stamps in exchange for $480 in cash.

The Secret Service had no further contact with Dougherty until he called the undercover number again on November 8, 1985, indicating his desire to purchase further food stamps. Dougherty initially stated that he could use $3,000 worth of food stamps. However, after learning that this might be his last opportunity to purchase stamps, Dougherty changed the figure to $4,000 worth of food stamps. During a still later phone conversation, Dougherty advised Meusberger that he was interested in acquiring all the $10,000 of food stamps that Meusberger indicated were available.

On November 20, 1985, Meusberger contacted Dougherty by phone and advised him that he had the $10,000 in food stamps Dougherty had requested. At this point Meusberger proceeded to Dougherty's home where he met with Dougherty and Dougherty's son. After some discussion, it was agreed that Meusberger would accept two checks totalling $5,000 for the $10,000 in food stamps. Meusberger again explained that his girlfriend stole the food stamps from work and expressed his desire not to go to jail as a result of this transaction. Meusberger then gave the food stamps to Dougherty who counted them to verify the amount. After determining that

* The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. The HONORABLE WARREN K. URBOM, United States District Judge for the District of Nebraska.

there were only $9,000 in food stamps instead of the $10,000 as agreed to, Meusberger left the checks and food stamps and walked out the door of the residence, ostensibly to obtain the final $1,000 in stamps. Once outside, Meusberger directed a surveillance team to enter the home and arrest Dougherty and his son. As the surveillance team was entering the house, Dougherty attempted to throw the packages of food stamps out of the back door.

Following his arrest, Dougherty was interrogated by the Secret Service. He admitted purchasing $970 in food stamps on May 15, 1985 at the Mountains Bar, and further acknowledged that on July 31, 1985 he purchased $950 in food stamps for $480 in cash. He also admitted that he had attempted to purchase $10,000 worth of food stamps for $5,000 in cash on November 20, 1985.

## II.

In his opening statement to the jury, the prosecutor made the following statement: "We also expect to call Mr. Artie Kehm who has himself been convicted of a felony offense relating to this investigation." The district court denied Dougherty's motion for a mistrial as a result of this statement. Subsequently, the court gave a curative instruction to the jury.

■ Dougherty asserts these statements made by the prosecutor in his opening statement warranted the district court to declare a mistrial. He asserts that under Fed.R.Evid. 609(a), the prosecution cannot mention a witness's prior conviction during opening statement. Under the law of this Circuit, the test for reversible prosecutorial misconduct has two parts: (a) the prosecutor's remarks or conduct must have in fact been improper, and (b) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial. *United States v. Hernandez*, 779 F.2d 456, 458 (8th Cir.1985). Not every impropriety of argument calls for a new trial or for a reversal of a judgment of conviction; nor should appellate courts reverse for such

improprieties unless persuaded that they prejudice the defendant and the prejudice was not removed by the trial judge before submission of the case to the jury. *Keeble v. United States*, 347 F.2d 951, 956 (8th Cir.), *cert. denied*, 382 U.S. 940, 86 S.Ct. 394, 15 L.Ed.2d 350 (1965). Moreover, the denial of a motion for mistrial is placed in the sound discretion of the district court and may only be reversed on a showing of abuse of discretion. *Hernandez*, 779 F.2d at 458.

### A.

■ We believe that the Assistant United States Attorney's reference in opening statement to Kehm's conviction was improper. The government asserts that its reference to Kehm's conviction was an attempt to blunt any potential impeachment of his credibility which would imply that he was lying in order to have his own sentence reduced. *See Hernandez*, 779 F.2d at 459; *United States v. Veltre*, 591 F.2d 347, 349 (5th Cir.1979). We would place credence in the government's argument if there were reason to believe the blunting was indeed necessary to avoid impeachment of Kehm. In fact, the prosecutor failed to blunt on direct examination any cross-examination which would go into Kehm's felony conviction; instead, the prosecutor told the jury gratuitously in opening statement that Kehm was convicted of a felony in this very set of transactions. By referring to Kehm's conviction in his opening statement, instead of waiting until direct examination, the Assistant United States Attorney created not only the possibility of a mistrial, but also the real potential that on appellate review, dependent upon the prejudicial effect of the prosecutor's remarks, an otherwise valid conviction could be reversed. *See United States v. Pierce*, 792 F.2d 740, 740 (8th Cir.1986); *Hernandez*, 779 F.2d at 459–60. This case demonstrates once again that too often in strong cases prosecutors make statements they need not make. Having let his "zeal out run discretion," *United States v. Killian*, 524 F.2d 1268, 1274 (5th Cir.1975), *cert.*

*denied*, 425 U.S. 935, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976), the prosecutor forces us to determine the prejudicial effect of his statement.

### B.

■ To determine the prejudicial effect of the prosecutor's improper statements, we must examine: (1) the cumulative effect of such misconduct; (2) the strength of the properly admitted evidence of the defendant's guilt; and (3) the curative actions taken by the trial court. *Hernandez*, 779 F.2d at 460.

In the present case, when viewed in the context of the entire trial, the statement made by the prosecutor had little, if any, cumulative effect on the outcome of the trial. The prosecutor made no further reference to Kehm's felony conviction and took additional measures to see to it that Kehm did not talk about his felony conviction during direct examination. Furthermore, the fact that the jury found Dougherty not guilty of the only transaction regarding the prosecutor's improper statement suggests that there was little cumulative effect on the jury.

In addition, there was overwhelming evidence of guilt as to the second and third counts irrespective of the improper statement made by the prosecutor. Tape recordings of each transaction, testimony, and exhibits conclusively demonstrated Dougherty's guilt with regard to the transactions occurring on July 31 and November 20.

Finally, the curative action taken by the trial court eliminated any prejudicial impact the improper statement would have had. The district court offered to give a curative instruction to the jury regarding the prosecutor's remarks. The court then advised the defendant that it would give such an instruction when requested by counsel. During the instruction conference, defendant's counsel did not object to giving a cautionary instruction, although not abandoning his motion for a mistrial. The court thereafter instructed the jury:

During his opening statement on Monday, the government counsel said Artie Kehm had been convicted of a felony. There is no evidence that Artie Kehm had been convicted of a felony and you must disregard entirely the statement that he has been.

(Tr. 720–21). Ideally, the trial court should have given a cautionary instruction to the jury immediately after the misconduct had occurred. *Hernandez*, 779 F.2d at 461. Although the curative instruction was not given immediately after the improper statement had been made by the prosecutor, it is clear that the district court's remedial action alleviated any possible prejudice. As a result, in the totality of the circumstances of the entire trial, there was no prejudice to the defendant because of the prosecutor's reference to Kehm's conviction.

### C.

■ In closing argument, the prosecutor made the following statement:

Let me talk first of all about this notion of specific intent. * * * The instruction only requires * * * that a defendant do an act which he believes the law forbids. Not the food stamp law. Mr. Nelson would suggest that you graft more into the instruction than is there. All I can say in that regard is to look at the instruction and to consider the instruction in the light of your common sense usage as to language.

(Tr. 709). Dougherty asserts prejudicial error regarding this comment. He argues that the insertion of the words "he believes" in the prosecutor's closing argument misled the jury to such an extent that a new trial is warranted. We do not believe that the prosecutor's statement in closing argument rises to the level of prosecutorial misconduct. Rather, the prosecutor's statement was nothing more than a recital of the holding in *Liparota v. United States*, 471 U.S. 419, 433–34, 105 S.Ct. 2084, 2092, 85 L.Ed.2d 434 (1985), in which the Court stated that "the Government need not show that he had knowledge of

specific regulations governing food stamp acquisition or possession." *Id.* at 434, 105 S.Ct. at 2092. The district court, therefore, did not err in denying Dougherty's motion for a mistrial with regard to the prosecutor's closing argument.

### III.

Dougherty also contends that the evidence presented at trial established that he was entrapped by agents of the Secret Service, and that he should have been acquitted on all counts without submitting the case to the jury.

In order for Dougherty to establish entrapment as a matter of law,

> [t]he evidence must have clearly indicated that a government agent originated the criminal design; that the agent implanted in the mind of an innocent person the disposition to commit the offense; and that the defendant then committed the criminal act at the urging of the government agent.

*United States v. Shaw*, 570 F.2d 770, 772 (8th Cir.1978). As the Supreme Court has indicated, the principal focus of this inquiry is upon the "intent or predisposition of the defendant to commit the crime." *United States v. Russell*, 411 U.S. 423, 429, 93 S.Ct. 1637, 1641, 36 L.Ed.2d 366 (1973). In distinguishing between the naive first offender and the street wise habitue, the cases reveal that the most important predisposition factor is whether a defendant's reluctance to engage in criminal activity has been overcome by repeated government inducement. *United States v. Lard*, 734 F.2d 1290, 1294 (8th Cir.1984). Viewing the evidence in this case in a light most favorable to the government, we conclude that the evidence established that Dougherty was predisposed to commit the charged crimes.

It is clear that Dougherty initiated contact with the Secret Service agents on July 29 and November 8, 1985 in order to purchase food stamps. He specified the dollar amount and, during the latter of the two transactions, actually increased the dollar amount at his own suggestion. The Secret Service agents did no more than offer him an opportunity to commit a crime. He willingly and knowingly engaged in a course of criminal conduct which he knew to be illegal.

Dougherty further argues that it is possible to infer from the jury's dismissal of Count II that the jury found that he had been entrapped with regard to the May 5, 1985 purchase of food stamps. He therefore contends by inference that Counts III and IV would have to be dismissed as well because tainted by the first transaction.

In a nearly identical case to the one at bar, the Seventh Circuit stated:

> [t]he court knows of no per se rule which provides that the taint of the first entrapment requires judgments of acquittal as to all subsequent transactions. To the contrary, as long as the evidence was sufficient to support the counts on which the defendant was actually convicted, a jury verdict reflecting compromise or even inconsistency is permissible and legitimate.

*United States v. Fields*, 689 F.2d 122, 125–26 (7th Cir.1982). Furthermore, the jury verdict in this case was not necessarily inconsistent. Even though the jury found Dougherty not guilty of Count II, we find that the additional evidence of Dougherty's conduct in arranging for the July 31 and November 20, 1985 food stamp purchases clearly establishes the requisite predisposition as to Counts III and IV. We, therefore, reject Dougherty's argument that his conviction for only the subsequent offenses was improper.

In addition to his entrapment argument, Dougherty argues that the government agents violated his due process rights and that he should have been given the opportunity to present evidence on this issue to the jury for its consideration. In *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), a plurality of the Court held that once predisposition had been shown, government misconduct could never be used to overturn the conviction, not even on due process grounds; rather,

the remedy lies in prosecuting the police. *Id.* at 490, 96 S.Ct. at 1650. However, five justices disagreed with this view, stating that due process may bar a conviction where the conduct of law enforcement authorities is sufficiently offensive, even though the defendant is "predisposed." *Id.* at 492, 96 S.Ct. at 1651 (Powell, J., concurring, joined by J. Blackmun); *id.* at 497, 96 S.Ct. at 1653 (Brennan, J. dissenting, joined by JJ. Stewart and Marshall). Therefore, apart from our conclusion that Dougherty failed to prove his entrapment defense, we need to examine whether the government conduct was "so outrageous that due process principles should bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. at 431–32, 93 S.Ct. at 1643; *United States v. Lard*, 734 F.2d at 1296–97.

■ We do not believe that the government conduct in this case involved extreme and questionable measures triggering fundamental fairness concerns. As stated earlier, the uncontroverted evidence established that Dougherty was predisposed to buy food stamps. In fact, the evidence demonstrates that it was Dougherty who initiated the July 31, 1985 and November 20, 1985 transactions. Moreover, whatever the parameters of the due process bar may be, it does not include the mere sale by the government of contraband to one predisposed to buy it. *Hampton*, 425 U.S. at 489–91, 96 S.Ct. at 1649–51. As the Court stated in *United States v. Khatib*, 706 F.2d 213 (7th Cir.1983):

> If his position were accepted, no conviction could ever be based on the sale of contraband by a government agent, because the agent would have introduced the essence of the illegality into the transaction.

*Id.* at 217. Moreover, the most effective way to catch and deter those who deal in large quantities of stolen food stamps may be for the government itself to provide the stamps to willing buyers. *United States v. Parisi*, 674 F.2d 126, 127 (1st Cir.1982); *see also United States v. Salazar*, 720 F.2d 1482, 1488 (10th Cir.1983). Thus, the dis-

trict court properly concluded that Dougherty's due process rights had not been violated by the Secret Service agents' selling him food stamps.

■ Dougherty next asserts that, if a due process violation were not established as a matter of law, he should have been allowed to introduce relevant evidence on this issue and the question should have been submitted to the jury for determination. In *United States v. Quinn*, 543 F.2d 640 (8th Cir.1976), this court held that "[a] claim of entrapment on the basis of outrageous government involvement does not present any question for a jury to decide but solely a question of law for the court." *Id.* at 648. In *United States v. Johnson*, 565 F.2d 179 (1st Cir.1977), the court held:

> Under any view, it is the court's province to decide whether a defendant's case was such that, if believed, it would fall into the exceptional category mentioned by Justice Powell [in *Hampton v. United States*, 425 U.S. 484, 493, 96 S.Ct. 1646, 1651, 48 L.Ed.2d 113 (1976)]. If such a determination were left to a jury's unguided discretion, as under the instruction proposed here, the entrapment defense as now understood would be transformed into an invitation to twelve jurors to consider in virtually any case whether the defendant was treated "fairly." Whatever its possible role in resolving contested factual issues raised by an entrapment defense, the jury is not equipped and should not be permitted to speculate on whether particular facts do or do not amount to fundamental fairness.

*Id.* at 181–82. We conclude that the district court properly refused to submit the issue of a due process violation to the jury. Moreover, because this was a question of law for the court to decide, we find no error in the district court's refusal to allow Dougherty to present evidence to the jury of a due process violation.

## IV.

Dougherty asserts that the government failed to present sufficient evidence of an

unauthorized acquisition of food stamps, of his specific intent, and that he actually had acquired food stamps on November 20, 1985.

■■■ Dougherty contends that there was no evidence of his unauthorized acquisition of food stamps in that Agent Meusberger legitimately possessed the stamps pursuant to a memorandum between the United States Secret Service and the Department of Agriculture; therefore, because Meusberger was authorized to possess the food stamps, Dougherty asserts that it could not have been a violation of 7 U.S.C. § 2024(b)(1) for him to have purchased them. In *United States v. French*, 683 F.2d 1189 (8th Cir.1982), we stated:

> In 7 U.S.C. § 2024(a), Congress authorized the issuance or presentment of food stamps for enforcement purposes. In 7 U.S.C. § 2024(b), Congress made the unauthorized acquisition of food stamps a crime. Obviously, Congress did not intend to exempt from criminal penalties anyone who acquired food stamps from an undercover agent. The fact that a seller is authorized to sell does not mean that the buyer must necessarily be cloaked with authority to buy.

*Id.* at 1194–95 (*quoting United States v. Stencil*, 629 F.2d 984, 985 (4th Cir.1980)); *see also United States v. Burrell*, 720 F.2d 1488, 1493–94 (10th Cir.1983). So, too, in this case because Meusberger was authorized to sell food stamps does not vest Dougherty with authority to purchase food stamps. Thus, we find this argument to be without merit.

Dougherty next argues that specific intent was not proven at trial because the government never demonstrated that he specifically knew what he was doing was unlawful. In *Liparota v. United States*, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985), the Court stated:

> This holding does not put an unduly heavy burden on the Government in prosecuting violators of § 2024(b). To prove that petitioner knew that his acquisition or possession of food stamps was unauthorized, for example, the Government

need not show that he had knowledge of specific regulations governing food stamp acquisition or possession. Nor must the Government introduce any extraordinary evidence that would conclusively demonstrate petitioner's state of mind. Rather, as in any other criminal prosecution requiring *mens rea*, the Government may prove by reference to facts and circumstances surrounding the case that petitioner knew that his conduct was unauthorized or illegal.

*Id.* at 433–34, 105 S.Ct. at 2092. The Court went on to note that evidence that a person bought food stamps at a substantial discount from face value, that the transaction took place in a back room to avoid being seen by others, and that the stamps had been marked "nontransferable" could lead to an inference that the petitioner knew his acquisition and possession of food stamps was unauthorized. *Id.* at 434 n. 17, 105 S.Ct. at 2093 n. 17.

■■■ The evidence in the present case indicates that Dougherty knew that he was obtaining the food stamps from a man whose girlfriend was stealing them from her workplace. In addition, he purchased them for half of their face value. Moreover, each of the food stamps that he was given was stamped "nontransferable." The jury could therefore reasonably infer from the evidence presented at trial that Dougherty knew that he was acting in violation of some law or regulation. The district court properly submitted the issue of specific intent to the jury and the jury properly found from the evidence that Dougherty knew his acquisition of food stamps was not authorized.

■■■ Dougherty further contends that the district court should have given his proffered instruction on the issue of specific intent. Dougherty's instruction would have required the government to prove he knew "regulations did not authorize him to acquire food stamps for money from a government agent who was then in lawful possession of the stamps." However, his instruction is an incorrect statement of the law. *See infra* at 772–73; *see also*

*Liparota*, 471 U.S. at 422 n. 3, 105 S.Ct. at 2086 n. 3. We find no error in the district court's refusal to submit Dougherty's instruction on the issue of specific intent.

■ Dougherty next argues that there was no evidence that he actually acquired the food stamps on November 20, 1985 because the transaction had not been completed at the time the Secret Service agents arrested him. Meusberger testified that Dougherty had taken physical possession of $9,000 in food stamps, counted the stamps book by book, and that he had the food stamps in his possession when the Secret Service agents arrested him. The evidence further indicated that Dougherty's son made out two checks, payable to Agent Muesberger's undercover identity, "Joe Scott," and handed both checks to Agent Meusberger while Dougherty was counting the food stamps.

The applicable statute, 7 U.S.C. § 2024(b)(1), states that "whoever knowingly * * * acquires * * * or possesses coupons or authorization cards in any manner not authorized by this chapter or the regulations issued pursuant to this chapter shall * * * be guilty of a felony * * *." The evidence shows that the November 20 transaction was interrupted only after Dougherty had taken the food stamps and counted them, and his son had written checks of $5,000 in order to purchase the stamps. Thus, the jury could reasonably conclude that Dougherty had "acquired" or "possessed" the stamps in violation of the statute.

## V.

Dougherty alleges that the superceding indictment charging him was insufficient because it did not specifically make reference to the statutes and regulations regarding what constitutes an unauthorized manner of acquiring food stamps. He further argues that the regulations themselves are too nonspecific to support a criminal prosecution, and that the district court erred in failing to dismiss the indictment and failing to give his requested instruction on the food stamp program.

■ The superceding indictment charged that Dougherty "did knowingly acquire United States Department of Agriculture food stamp coupons * * * in a manner not authorized by the provisions of Chapter 51, Title 7, United States Code, and the regulations issued pursuant to said Chapter." The indictment follows the wording of the statute. It fully, expressly, and without ambiguity sets forth the elements necessary to constitute the offense, and contains a statement of facts and circumstances sufficient to inform the accused of the offense with which he is charged. *United States v. French*, 683 F.2d at 1194. Thus, Dougherty's argument concerning the sufficiency of the indictment is without merit.

Dougherty cites no authority to support his contention that his proffered food stamp program instruction was a more correct statement of the law than the instruction submitted by the court. The instruction given was approved by this court in *French*. 683 F.2d at 1195. He therefore demonstrates no error in the instruction given by the district court.

## VI.

In response to an oral motion to suppress, the prosecution presented evidence outside the presence of the jury, regarding a statement made by Dougherty on November 20, 1985 to the Secret Service. After Dougherty had been informed of his rights, he signed a form indicating that he understood his rights and had no further questions regarding them. The interrogating agent then obtained Dougherty's statement which Dougherty read and signed as accurate.

Dougherty now argues that the statement should not have been introduced into evidence because the agent did not receive an express waiver of each right found on the warning of rights form and statement form. The court ruled that the statement given by Dougherty was freely, voluntarily, and knowingly made, and thus allowed

the introduction of evidence regarding his confession.

Whenever the state bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of his *Miranda* rights, the state need prove waiver only by a preponderance of the evidence. *Colorado v. Connelly,* — U.S. —, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986). The question of whether a defendant has waived *Miranda* rights is one of fact, and the trial judge's findings of fact regarding defendant's waiver will not be overturned unless clearly erroneous. *United States v. Ashby,* 771 F.2d 392, 395 (8th Cir.1985). The totality of the circumstances of each case must be examined to determine if an accused has made a voluntary, knowing, and intelligent waiver of his rights to remain silent and to have counsel present. *Lamp v. Farrier,* 763 F.2d 994 997 (8th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 534, 88 L.Ed.2d 465 (1985).

The evidence demonstrates that Dougherty knowingly, voluntarily, and intelligently waived his rights and provided Agent Henderson with a statement concerning the food stamp transactions. Dougherty was informed verbally of his rights and was afforded the opportunity to read the warning of rights form and the written statement regarding the prior transactions, and acknowledged on the written form that the statement he had been given was correct. From this record we conclude that the findings of the district court at the suppression hearing and at trial were not clearly erroneous.

## VII.

At sentencing, the district court suspended the execution of a sixty-day period of incarceration and placed Dougherty on probation for one year. Two of the conditions of his probation were that he pay $470 in restitution and pay taxable costs of prosecution.

Dougherty argues that the government suffered no loss from his illegal purchase of $950 in food stamps in exchange for $480 on July 31, 1985. This argument is merely a restatement of his earlier argument that he did not "acquire" the stamps in an unauthorized manner because Agent Meusberger in his undercover capacity created the crime and therefore the government cannot claim restitution. Once again, his argument is without merit.

Section 3651 of Title 18 specifically outlines that a court may, in suspending a sentence and imposing probation, require "restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had * * *." The evidence in this case established that Dougherty unlawfully acquired $950 in food stamps in exchange for $480 in cash on July 31, 1985. In effect, there was a loss to the United States Department of Agriculture in the amount of $470. As a result, the United States, as dispenser of the food stamps, would be the aggrieved party for purposes of restitution under 18 U.S.C. § 3651. We conclude, therefore, that the district court properly awarded restitution to the United States.

Dougherty also asserts that the district court erred in taxing costs of defense witnesses on him. The district court assessed $307.80 in costs against Dougherty, $187.80 of which was for defense witnesses. Section 1920 of Title 28 gives a judge or clerk the authority to tax costs, including fees and disbursements for witnesses. 28 U.S.C. § 1920(3). Generally, a district court's taxation of costs may be set aside only upon a finding of abuse of discretion. *United States Marshals Service v. Means,* 741 F.2d 1053, 1057–58 (8th Cir. 1984) (en banc).

Dougherty asserts that the assessment of costs for defense witnesses is contrary to the spirit of the Criminal Justice Act, 18 U.S.C. § 3006A [CJA]. The CJA recognizes the need for supporting services to a defense by providing that the United States will pay for "investigative, expert, or other services necessary to an adequate defense" if the defendant is unable to pay for them. 18 U.S.C. § 3006A(e). Dougherty does not

assert that the defense witnesses were "necessary" to his defense within the parameters of the CJA. Thus, we conclude that the CJA is not applicable to this case. *See United States v. Maret,* 433 F.2d 1064, 1068–69 (8th Cir.1970). Nor do we find compelling his assertion that the assessment of costs is somehow inconsistent with the "spirit" of providing an adequate defense without running the indigent defendant into debt. The state need not purchase for the indigent defendant all the assistance that his wealthier counterpart can buy. *Ake v. Oklahoma,* 470 U.S. 68, 71, 79–80, 105 S.Ct. 1087, 1090, 1095, 84 L.Ed.2d 53 (1984); *see also Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985). Thus, we conclude that the district court reasonably exercised its discretion under 28 U.S.C. § 1920(3) in taxing costs to the defendant as a special condition of probation.

Having carefully reviewed all of Dougherty's arguments, we find no reversible error by the district court. The judgment is affirmed.