_____

No. 95-1996
_____

United States of America,           *
                                     *
          Plaintiff - Appellee,      *
                                     *
     v.                              *
                                     *
Stephanie Cannon, also known as      *
Stephanie Lynch,                     *
                                     *
          Defendant - Appellant.     *

                                          Appeals from the United States
                                          District Court for the
_____                           District of North Dakota.

No. 95-1997
_____

United States of America,           *
                                     *
          Plaintiff - Appellee,      *
                                     *
     v.                              *
                                     *
Keith Anthony Cannon,                *
                                     *
          Defendant - Appellant.     *

_____

No. 95-2233
_____

United States of America,           *
                                     *
     Plaintiff - Appellant,          *
                                     *
     v.                              *
                                     *
Stephanie Cannon, also known as      *
Stephanie Lynch,                     *
                                     *
          Defendant - Appellee.      *

_____    *
                                       *
United States of America,              *
                                       *
     Plaintiff - Appellant,    *
                                       *
     v.                          *
                                       *
Keith Anthony Cannon,                  *
                                       *
     Defendant - Appellee.      *

_____

Submitted:  November 14, 1995

Filed:  July 10, 1996
_____

Before HANSEN, JOHN R. GIBSON, and MURPHY, Circuit Judges.
_____

HANSEN, Circuit Judge.

Stephanie Cannon and Keith Anthony Cannon were convicted of various drug and firearm offenses.  They challenge the validity of their convictions, raising a number of issues including entrapment, outrageous government conduct in violation of their due process rights, and prosecutorial misconduct.  The United States cross appeals, contending that the district court erroneously sentenced the defendants.  We reverse and remand.

I.

Viewing the evidence in the light most favorable to the verdicts, a reasonable jury could have found the following.

Keith Cannon and Stephanie Cannon (collectively, "Defendants"), residents of Minneapolis, Minnesota, sold cocaine

base on four occasions to Special Agent Charles Sherbrooke, an undercover officer with the West Central Minnesota Drug Task Force. The first transaction was recorded on audio tape, and the latter three transactions were videotaped.

Defendants met Agent Sherbrooke for the first time in Alexandria, Minnesota, when the parties were introduced by a confidential informant. Defendants sold cocaine base to Agent Sherbrooke and told him they were interested in acquiring firearms. The parties made arrangements to meet again in Alexandria within a week.

As planned, Defendants sold more cocaine base to Sherbrooke less than a week later. When Sherbrooke asked Defendants whether they were still interested in obtaining firearms, Defendants again indicated their interest, this time specifically stating that they wanted two .38 caliber snub nosed revolvers, two derringers, and one .25 caliber automatic pistol. Sherbrooke said he had a supplier who could provide those weapons and offered to get anything else Defendants might want. He explained that the deal would have to take place in North Dakota, however, because there was an arrest warrant out for his supplier in Minnesota. When Sherbrooke kidded Defendants about their reasons for wanting the weapons, Defendants said they were "desperate" because they had had drugs stolen from them in the past.

Two days later, the parties met for a third time in Alexandria, and Sherbrooke again purchased cocaine base from Defendants. The conversation immediately turned to the plans for the next transaction. Stephanie Cannon again told Sherbrooke she was interested in obtaining five handguns, and Sherbrooke replied, as he had at the prior meeting, that his supplier could get her the handguns and anything else she might want. At three points in the conversation, Sherbrooke stated that Defendants would have an assortment of about 15 weapons from which to choose. When

Sherbrooke asked how much a couple of "oz's" of cocaine base would cost him, Keith Cannon answered and then noted that the parties could trade guns for drugs. Before parting, the parties agreed to meet in Fargo, North Dakota, the following week.

As scheduled, the fourth and final transaction occurred at a motel in Fargo. Agent Sherbrooke introduced Defendants to Special Agent John Keating of the Bureau of Alcohol, Tobacco, and Firearms, who posed as Sherbrooke's firearm supplier. When everyone was introduced, Sherbrooke served Defendants alcoholic drinks. After some initial small talk, the parties discussed the terms of sale for the cocaine base Defendants had brought. The conversation then turned to the subject of firearms.

Agent Keating had with him 10 firearms in a dufflebag, including three 9 mm semi-automatic pistols, two .25 caliber semi-automatic pistols, two .38 caliber revolvers, one .357 magnum caliber revolver, and two MAC-type machine guns -- one a .45 caliber and the other a .380 caliber. Keating removed each weapon from the bag, briefly identifying it and showing it to Defendants. When Keating described the larger of the machine guns as capable of holding 30 rounds, Sherbrooke called it a "neat item." Keating explained that the smaller machine gun could hold 15 rounds.

Defendants proceeded to inspect the various firearms. Keith Cannon expressed his concern that the .25 caliber semi-automatic pistol would not inflict enough damage. Agent Keating disagreed but noted it was not as powerful as the machine guns. When Keating explained again that the larger machine gun could hold 30 rounds, quite a bit of protection for Defendants' drug business, Sherbrooke chimed in that that was a "lot of rock and roll." After some discussion on the various makes of handguns, Defendants selected three of them.

4

The parties' attention then turned to a discussion on how Sherbrooke had been shorted in an earlier deal with the Defendants. After they resolved that issue, Agent Sherbrooke inquired whether Defendants wanted any of the remaining guns. Keith said no. Keith stated, however, that he wanted to get together with Keating later to purchase an "Uzi or some type of automatic weapon." Stephanie pointed to the machine gun and said, "That's it." Keith explained the dangers the Defendants face on the street and said he needed a powerful gun for protection. He concluded he wanted a machine gun with 50 rounds, because "I get crazy sometimes." Keith told the officers he wanted to purchase such a gun at their next meeting.

Sherbrooke asked Keating whether the machine guns would be available for sale in the future. Keating replied that he expected to sell the guns he had brought to this meeting to another buyer if Defendants did not purchase them. Keith stated he would like to purchase a machine gun at the next meeting, again stressing the need for protecting the business. He stated, "I believe in sprayin' everything that's moving." Both Defendants said that, in the meantime, the handguns would hold them over. Sherbrooke picked up one of the machine guns and began examining its features. Keating noted the gun's rapid rate of fire.

Stephanie then asked whether the Defendants could trade drugs for a machine gun. The agents answered affirmatively, and the parties agreed to barter three ounces of cocaine base for three handguns, the MAC-type .380 caliber machine gun, and $4,600 in United States currency. After the exchange, Defendants carried their newly acquired weapons out of the motel, where law enforcement officers were waiting.

Defendants were arrested and charged in a nine-count indictment, which included counts of distribution of cocaine base and conspiracy to distribute and to possess with intent to distribute, in violation of 21 U.S.C. §§ 841(a) and 846; of

5

knowingly using and carrying firearms during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and of knowingly and unlawfully possessing a machine gun, in violation of 18 U.S.C. §§ 922(o) and 924(a)(2).  Keith Cannon was also charged with being a felon knowingly in possession of firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  One count was dismissed by the Government before trial.

The case proceeded to trial in the United States District Court for the District of North Dakota.  Defendants filed a pretrial motion to dismiss the indictment, contending the officers had violated Defendants' due process rights by artificially creating venue in the District of North Dakota.  Defendants alternatively moved for transfer of venue pursuant to Rule 21(a) and (b) of the Federal Rules of Criminal Procedure.  The district court denied these motions.  Defendants also moved to dismiss the counts relating to receiving and possessing the machine gun on grounds of due process and entrapment as a matter of law.  In support of this motion, Defendants referred the court to the video and audio tapes of the drug and firearms transactions, but did not provide the court copies of the tapes.  Finding the evidence before him insufficient to support Defendants' claims, the district judge denied Defendants' motion.

At trial, Defendants presented an entrapment defense, but the jury rejected it and returned guilty verdicts on all counts.  Defendants raised the defense again in posttrial motions for judgment of acquittal and for a new trial.  The district court denied the motions and held that Defendants were not entrapped as a matter of law.  At sentencing, however, the court found that the government had engaged in sentencing entrapment and sentencing manipulation with regard to the machine gun charges.  Accordingly, the court did not impose the mandatory, consecutive, 30-year sentence for knowingly using and carrying a machine gun during and in relation to a drug trafficking offense, imposing instead the

mandatory, consecutive, 5-year sentence for using or carrying a firearm during and in relation to a drug trafficking offense. See 18 U.S.C. § 924(c)(1). Defendant Keith Cannon was sentenced to 216 months in prison (156 + 60) and a five-year term of supervised release, and fined $17,500. Stephanie Cannon was sentenced to 181 months in prison (121 + 60) and a five-year term of supervised release, and fined $17,500. Defendants appeal their convictions and sentences on numerous grounds, and the government cross appeals the sentences.

**II.**

A. VENUE

The first three drug deals occurred in Minnesota, where Defendants reside, and the fourth transaction took place in North Dakota. Defendants, both of whom are African-Americans, moved to dismiss the indictment, claiming the government had violated their due process rights by manipulating the transactions to create venue in North Dakota. In the alternative, they moved for transfer of venue pursuant to Rule 21(a) and (b) of the Federal Rules of Criminal Procedure. The district court denied Defendants' motions for lack of evidentiary support.

Defendants argue that the district court erred in denying their motion to dismiss on due process grounds. Relying on Batson v. Kentucky, 476 U.S. 79 (1986), Defendants claim the facts of this case give rise to an inference that the government officers lured them to North Dakota for the fourth transaction as a ruse to create venue in a rural district with a significantly lower minority population than the Minnesota population. Because the government offered no explanation for its actions, see id. (requiring government to come forward with a neutral explanation to rebut prima facie case of discrimination), Defendants contend the government's conduct was outrageous, and the indictment should have

7

been dismissed.  See United States v. Russell, 411 U.S. 423, 431-32 (1973).

We agree with the district court that Defendants' argument lacks evidentiary support.  Defendants cite only the 1990 census, which found that African-Americans constitute 2.17 percent of the Minnesota population and 0.6 percent of the North Dakota population.  Defendants did not show what the minority population figures are for the geographic area of Minnesota from which a jury would have been picked if trial had been held in Minnesota, nor the minority population figures for the division of the district of North Dakota where trial was held.  The variance in minority population in the two states is insufficient alone to create an inference that Defendants were purposefully enticed to North Dakota in order to control intentionally the racial composition of the jury.  Cf. United States v. Garcia, 991 F.2d 489, 492 (8th Cir. 1993) (stating that a numerical disparity alone does not establish the systematic exclusion of a group in jury selection process).  Because of the insufficient evidence, we do not believe the first element of a Batson-type analysis has been made out in this case, if indeed a Batson-type analysis can be applicable to a motion for a transfer of venue.  Defendants therefore have failed to meet the high threshold for establishing outrageous government conduct in violation of their due process rights.  Cf. Bell v. United States, 48 F.3d 1042, 1044 (8th Cir. 1995) (holding that failure to offer proof of impermissible motives for choosing to prosecute in federal forum precludes finding of due process violation).

Defendants also challenge the district court's decisions on the Rule 21 motions.  As a preliminary matter, we note that venue was proper in North Dakota under 18 U.S.C. § 3237(a), which creates venue in any district where the alleged criminal conduct occurs.  If, however, the district court believed Defendants would not receive a fair and impartial trial due to existing prejudice in North Dakota, the district court was required to transfer the

8

trial. Fed. R. Crim. P. 21(a). In addition, the court also could exercise its discretion and transfer the trial to another district in the interest of justice and for the convenience of the parties. Fed. R. Crim. P. 21(b). Defendants contend the district court abused its discretion in denying their Rule 21 motions, because, as African-American defendants from a large city, they could not obtain a fair and impartial trial as described in Rule 21(a), and a transfer of venue was in the interest of justice, Rule 21(b).

We agree with the district court that these motions, like Defendants' motions to dismiss on due process grounds, are conclusory and lacking in evidentiary support. Defendants support their Rule 21 challenges with no more evidence than they cited for their due process argument. We therefore find no abuse of discretion in the denial of the motions to transfer venue. Rizzo v. United States, 304 F.2d 810, 817 (8th Cir.) (standard of review), cert. denied, Nafie v. United States, 371 U.S. 890 (1962).

B. PROSECUTORIAL MISCONDUCT

During his rebuttal closing argument, the prosecutor twice referred to Defendants as "bad people." When defense counsel objected to this as an improper reference to Defendants' character, the district court overruled the objection, stating that closing arguments can be argumentative. The prosecutor then continued, "There are bad people in the world, ladies and gentlemen. We are lucky where we live not to come in contact with as many as there may be in other parts of the country. But there are still some around here." (Tr. of Rebuttal Closing Arg. by Gov't at 8, Jan. 20, 1995.) The remainder of the closing argument did not refer to Defendants' character. Defendants contend the reference to "bad people" constitutes prosecutorial misconduct that deprived them of a fair trial.

We afford the district court broad discretion in controlling closing arguments, overturning the lower court only when it clearly abuses its discretion. <u>United States v. Nelson</u>, 988 F.2d 798, 807 (8th Cir.), <u>cert. denied</u>, 114 S. Ct. 302 (1993). We examine prosecutorial remarks to determine, first, whether the remarks were in fact improper, and if so, whether, in the context of the entire trial, the remarks "`prejudicially affected [Defendants'] substantial rights, so as to deprive [them] of a fair trial." <u>United States v. Malone</u>, 49 F.3d 393, 398 (8th Cir.) (quoting <u>United States v. Hernandez</u>, 779 F.2d 456, 458 (8th Cir. 1985)), <u>cert. denied</u>, 116 S. Ct. 208 (1995). If we reach the second step, we consider: "(1) the cumulative effect of such misconduct; (2) the strength of the properly admitted evidence of [Defendants'] guilt; and (3) the curative actions taken by the trial court." <u>United States v. Eldridge</u>, 984 F.2d 943, 946-47 (8th Cir. 1993).

We have no doubt that the prosecutor's statements in this case were improper. Prosecutors must refrain from using methods calculated to produce a wrongful conviction. <u>United States v. Young</u>, 470 U.S. 1, 7 (1985). Although a prosecutor "may strike hard blows, [the prosecutor] is not at liberty to strike foul ones." <u>Id.</u> Referring to defendants as "bad people" simply does not further the aims of justice or aid in the search for truth, and is likely to inflame bias in the jury and to result in a verdict based on something other than the evidence. Therefore, the remarks were highly improper. <u>Cf.</u> <u>United States v. Singer</u>, 660 F.2d 1295, 1304 (8th Cir. 1981) (finding prosecutor's reference to "crooks" improper), <u>cert. denied</u>, 454 U.S. 1156 (1982); <u>Hall v. United States</u>, 419 F.2d 582, 587-88 (5th Cir. 1969) (finding prosecutor's reference to "hoodlums" improper). We further perceive a thinly veiled appeal to parochial allegiances in the prosecutor's remarks. We should not have to remind an Assistant United States Attorney that the Defendants are citizens of the United States as well, and that it was a court of the United States in which the proceedings

were being held.  The district court erred by not sustaining the objection and by failing to take curative action.

Having determined the remarks to be improper, we must decide their effect on the Defendants' fair trial rights using the three factor test from <u>Eldridge</u>.  While the conduct occurred only during the prosecutor's final rebuttal argument, "`a single misstep' on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated."  <u>United States v. Solivan</u>, 937 F.2d 1146, 1150 (6th Cir. 1991) (quoted with approval in <u>United States v. Johnson</u>, 968 F.2d 768, 771 (8th Cir. 1992)).  Because the remark came during rebuttal arguments, defense counsel was unable to respond except by objection.

We have indicated that an improper argument is less likely to have affected the verdict in a case when the evidence is overwhelming than in a case where the evidence is weak.  <u>United States v. Splain</u>, 545 F.2d 1131, 1135 (8th Cir. 1976).  While the government's evidence is probably strong enough on the drug charges to be called overwhelming, the evidence concerning the machine gun and the Defendants' predisposition to purchase it is not so strong as to be called overwhelming, and indeed the experienced district judge was convinced enough that he found at the sentencing hearing that the Defendants had no predisposition to acquire a machine gun.  Tr. Sent. at 45 ("I know from the facts that I heard on two or three different occasions that the Defendants had no predisposition to acquire a machine gun.");  <u>id.</u> at 47 ("My God, folks, we cannot permit well meaning, capable law enforcement people to entice people to violate the law in this way.").  Finally, we note that the district judge's failure to sustain the defense counsel's objection to the remarks (and indicating that closing arguments are argumentative) meant that there was no curative instruction given to neutralize the prejudicial effect of the prosecutor's remarks.

We believe that by twice calling the African-American Defendants "bad people" and by calling attention to the fact that the Defendants were not locals, the prosecutor gave the jury an improper and convenient hook on which to hang their verdict, and we are not prepared to say that the evidence was so overwhelming that the court's error in permitting the improper comments to stand was harmless beyond a reasonable doubt. We conclude that the Defendants are entitled to a new trial on all counts. Accordingly, we reverse and remand.

Because we reverse and remand for a new trial, we deem it unnecessary to determine if the district court was correct in its decision that both sentencing entrapment and sentencing manipulation had occurred in this case. We do address those issues that may arise again at a second trial.

C. EVIDENTIARY CHALLENGE

Defendants challenge the admission of each of the four quantities of cocaine base purchased at each transaction, contending the government failed to prove a proper chain of custody. Specifically, Defendants argue the government failed to show what happened to the cocaine base between the time it was mailed to a DEA laboratory for testing and the time when a DEA forensic chemist at the laboratory tested it.

We review a district court's decision to admit evidence over an objection for an abuse of discretion. United States v. Carpenter, 70 F.3d 520, 520 (8th Cir. 1995). A district court may admit physical evidence if the court believes a reasonable probability exists that the evidence has not been changed or altered. United States v. Miller, 994 F.2d 441, 443 (8th Cir. 1993). In making this determination, absent a showing of bad faith, ill will, or proof of tampering, the court operates under a presumption of integrity for the physical evidence. Id. Here, the

12

only change in the cocaine occurred when the DEA chemist pulverized the rocks of cocaine for testing. Because Defendants failed to aver any facts rebutting the presumption of integrity, we find no abuse of discretion in the admission of the cocaine base as evidence in this case.

D. RULE OF LENITY

Defendants also challenge the district court's decisions not to authorize them to obtain expert testimony on the chemical compositions of cocaine and cocaine base. Initially, Stephanie filed a pretrial application asking the district court to authorize the costs of obtaining transcripts from other cases in which experts had testified on this issue. She explained that she intended to show that the heightened penalty for cocaine base should be ignored under the rule of lenity, because the distinction between cocaine and cocaine base is scientifically meaningless. The district court denied the application, holding the transcripts were not necessary to Stephanie's defense because our court has overwhelmingly rejected challenges to the statutory differences in sentences imposed for convictions involving cocaine base and cocaine. Stephanie and Keith then filed another application, not only seeking reconsideration of the decision regarding the transcripts, but also requesting authorization to employ a chemistry expert to testify at their trial that cocaine and cocaine base are the same thing. Citing the reasoning previously stated in denying the first application, the district court denied Defendants' request. At sentencing, the court again rejected Defendants' position regarding the rule of lenity.

Defendants were each represented by appointed counsel pursuant to the Criminal Justice Act (CJA), 18 U.S.C. § 3006A. Under subsection 3006A(a) of the CJA, adequate representation includes, among other things, expert services "necessary for the defense." If a district court finds that such services are necessary and

13

beyond a defendant's financial means, the court "shall authorize counsel to obtain the services." Id. at § 3006A(e)(1). We afford the district court wide discretion in deciding whether the appointment of experts would aid defendants in preparing and presenting an adequate defense. United States v. Moss, 544 F.2d 954, 961 (8th Cir. 1976), cert. denied, 429 U.S. 1077 (1977).

We find no abuse in the district court's conclusion that the expert testimony sought here was unnecessary. As the district court observed, our court has repeatedly rejected constitutional challenges to the difference in penalties for convictions involving cocaine and cocaine base. See, e.g., United States v. Johnson, 28 F.3d 1487, 1494 (8th Cir. 1994), cert. denied, 115 S. Ct. 768 (1995), and Scott v. United States, 115 S. Ct. 1263 (1995); United States v. Maxwell, 25 F.3d 1389, 1396-97 (8th Cir.), cert. denied, 115 S. Ct. 610 (1994); United States v. Buckner, 894 F.2d 975, 978-81 (8th Cir. 1990). Furthermore, we recently rejected Defendants' argument that 21 U.S.C. § 841(b) is unconstitutionally vague and that we should consequently ignore its heightened penalty provisions for cocaine base under the rule of lenity. United States v. Jackson, 64 F.3d 1213, 1219 (8th Cir. 1995), cert. denied, 116 S. Ct. 966 (1996). The district court therefore did not abuse its discretion by refusing to authorize Defendants' requests, and the court's decision not to invoke the rule of lenity at sentencing was correct.

E.  ENTRAPMENT

Defendants challenge their convictions, arguing that the district court erred in denying their motions for judgment of acquittal and their motions for a new trial on the grounds of entrapment. We disagree.

The defense of entrapment stems from a concern that law enforcement officials and agents should not manufacture crime.

14

United States v. Lard, 734 F.2d 1290, 1293 (8th Cir. 1984).  To be entitled to jury instructions on an entrapment theory, defendants must show some evidence that the government agents implanted the criminal design in their minds and induced them to commit the offense.  United States v. Eldeeb, 20 F.3d 841, 843 (8th Cir.), cert. denied, 115 S. Ct. 269 (1994).  Once a defendant has made this showing, the government then has the burden of proving that the defendant was predisposed to commit the crime, apart from the government's inducement.  Jacobson v. United States, 503 U.S. 540, 553-54 (1992).  An inquiry concerning predisposition "focuses upon whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime." Mathews v. United States, 485 U.S. 58, 63 (1988) (internal quotations omitted).  In other words, "determining a defendant's predisposition requires examination of the defendant's personal background to see `where he sits on the continuum between the naive first offender and the streetwise habitue.'"  United States v. Kummer, 15 F.3d 1455, 1459 (8th Cir. 1994) (quoting Lard, 734 F.2d at 1293).

Entrapment is generally a jury question.  United States v. Pfeffer, 901 F.2d 654, 656 (8th Cir. 1990).  The trial court may enter a judgment of acquittal, however, when the evidence clearly establishes the elements of entrapment as a matter of law.  Id.  The elements of entrapment as a matter of law are: "(1) that a government agent originated the criminal design; (2) that the agent implanted in the mind of an innocent person the disposition to commit the offense; and (3) that the defendant committed the criminal act at the urging of the government agent." Id.  We view the facts in the light most favorable to the government, reversing only when no reasonable jury could have reached the guilty verdict.  Id.

Considering the evidence in this case, we can easily dispose of Defendants' contention that they were entitled to a judgment as

15

a matter of law on the drug charges.  The evidence overwhelmingly proves their predisposition to traffick drugs, and their own recorded statements about having been robbed of a sizeable quantity of drugs in the past reveal their already established criminal drug-dealing proclivity prior to the government's sting operation.

We also have no difficulty disposing of Defendants' argument as to the handgun verdicts on the § 924(c) charges.  Within the first minute of the first transaction, the Defendants indicated their interest in acquiring specific firearms.  They reiterated their interest at subsequent meetings and even ordered particular types of handguns.  They agreed to a meeting in North Dakota, and drove there, for the specific purpose of purchasing handguns in conjunction with a drug transaction.  Under these facts, they were not entitled to a judgment as a matter of law.

Defendants argue that even if they were predisposed to purchase firearms, there is no evidence that they were predisposed to purchase a machine gun prior to the government's bringing of the machine guns to the Fargo meeting.  We believe the circumstantial evidence in this case is sufficient for a reasonable jury to conclude Defendants were predisposed, independent of any government inducement, to possess a machine gun.  See United States v. Kummer, 15 F.3d 1455, 1457 n.7 (8th Cir. 1994) (listing factors, some of which involve circumstantial evidence, courts have considered in determining whether a defendant is predisposed to commit a crime).[1]  Defendants were clearly engaged in closely related criminal

---

[1]"Among the factors lower courts have looked to in determining whether a defendant was predisposed are:  (1) whether the defendant readily responded to the inducement offered;  (2) the circumstances surrounding the illegal conduct;  (3) whether the defendant was engaged in an existing course of conduct similar to the crime for which he is charged;  (4) the defendant's reputation;  and (5) the conduct of the defendant during the negotiations with the undercover agent."  Id. (citing United States v. Dion, 762 F.2d 674, 687-88 (8th Cir. 1985), rev'd on other grounds, 476 U.S. 734, (1986)).

16

activity, i.e., they came to Fargo specifically to purchase firearms illegally and to engage in established and ongoing drug trafficking, where firearms are tools of the trade. The record in this case contains evidence that a machine gun is a drug dealer's most prized possession. A reasonable jury could therefore conclude Defendants are much closer on the continuum to a streetwise habitue than a naive first offender. Additionally, Keith Cannon's comments during the negotiations of the firearm transaction, stressing the need to protect Defendants' drug operation and indicating they wanted even more fire power (a weapon capable of holding 50 rounds) than the available firearms offered, reveal the Defendants' interest in possessing a machine gun and the intent to obtain one. Considering this circumstantial evidence, a reasonable jury could indeed take the small inferential step of concluding that Defendants were predisposed to obtaining a machine gun independent of any government inducement.

F.   OUTRAGEOUS GOVERNMENT CONDUCT DEFENSE

Defendants also frame their challenge to the convictions involving the machine gun as a violation of due process, contending that the officers' conduct was so outrageous that the district court should have dismissed counts six and seven of the indictment. According to Defendants, selling them a machine gun when they had not specifically asked for one violated their due process rights, because the officers' conduct was aimed solely at increasing Defendants' sentence for count six by 25 years.[2] See 18 U.S.C. § 924(c) (30-year mandatory consecutive sentence for using or carrying a machine gun in relation to a crime of drug trafficking; 5-year sentence for handguns); see Russell, 411 U.S. at 431-32 (acknowledging the possibility of government conduct so outrageous

_____

[2]Defendants were also convicted of count seven, unlawfully possessing a machine gun, in violation of 18 U.S.C. § 922(o). This provision does not contain a mandatory prison term, however, so our discussion focuses on the 18 U.S.C. § 924(c) charge.

17

and fundamentally unfair that due process principles would bar the conviction of a defendant); Hampton v. United States, 425 U.S. 484, 491-500 (1976) (majority of Supreme Court, in concurring and dissenting opinions, agreeing that outrageous government conduct defense may exist for a defendant predisposed to commit a crime).

The government, on the other hand, argues that no due process violation occurred in this case. The government further urges this court not to unduly constrain law enforcement officials by limiting them to buy or sell only what defendants specifically request or by placing a burden on the government to set forth motives for each and every step of law enforcement activities. The district court denied Defendants' motion to dismiss counts six and seven of the indictment on due process grounds. We review this question of law de novo. United States v. Dougherty, 810 F.2d 763, 770 (8th Cir. 1987).

The defense of outrageous government conduct is similar to, though distinct from, the defense of entrapment. Both defenses frequently arise in prosecutions resulting from sting and reverse-sting operations. Unlike the entrapment defense, however, which focuses on the Defendant's predisposition to commit the crime, the outrageous government conduct defense focuses on the government's conduct. Kummer, 15 F.3d at 1459 n.9.

The vexing question before us is where the line lies between covert investigative conduct by law enforcement officers that is within constitutional bounds, and which is inherent in every sting and reverse-sting operation, and conduct that is "`so outrageous and shocking that it exceed[s] the bounds of fundamental fairness.'" United States v. Huff, 959 F.2d 731, 734 (8th Cir.) (quoting United States v. Johnson, 767 F.2d 1259, 1275 (8th Cir. 1985)), cert. denied, 506 U.S. 855 (1992), and Love v. United States, 506 U.S. 855 (1992). In finding that line, we must keep in mind that "`[t]he level of outrageousness needed to prove a due

18

process violation is quite high, and the government's conduct must shock the conscience of the court.'" <u>United States v. Jensen</u>, 69 F.3d 906, 911 (8th Cir. 1995) (quoting <u>United States v. Pardue</u>, 983 F.2d 843, 847 (8th Cir. 1993)), <u>cert. denied</u>, 1996 WL 163952, 64 USLW 3722, 64 USLW 3726 (U.S. Apr. 29, 1996) (No. 95-1582). Further, we have noted that we "`should go very slowly before staking out rules that will deter government agents from the proper performance of their investigative duties.'" <u>United States v. Barth</u>, 990 F.2d 422, 425 (8th Cir. 1993) (quoting <u>United States v. Connell</u>, 960 F.2d 191, 196 (1st Cir. 1992)). We have also stated "that investigative officers and agents may go a long way in concert with the individual in question without being deemed to have acted so outrageously as to violate due process . . . ." <u>Kummer</u>, 15 F.3d at 1460 (quoting <u>United States v. Quinn</u>, 543 F.2d 640, 648 (8th Cir. 1976)). After thorough review of the record and the briefs, and keeping in mind the above principles, we conclude the officers' conduct in this case was not so shocking that it crossed over the constitutional line, violating Defendants' due process rights. We are fortunate in this case not to have to work from a cold record. We have availed ourselves of the opportunity to view the video tape of the actual drugs-for-guns transaction and have studied it carefully.

We look first at the agents' act of offering a selection of firearms other than the type Defendants had requested. This conduct is neither outrageous nor shocking. Defendants had told the officers on numerous occasions that they wanted to obtain firearms. Although Defendants had requested particular weapons, Officer Sherbrooke thrice told Defendants that his supplier would bring a selection of about 15 weapons from which Defendants could make their final choices. Defendants did not object to this procedure and at least tacitly agreed to it. Under these circumstances, we find nothing shocking, outrageous, or even surprising in the officers' providing a selection of weapons to willing buyers. We believe the officers were permitted to test the

19

limits of the Defendants' willingness to acquire firearms illegally in general and were not limited just to filling the customers' order.

Having literally looked at the officers' salesmanship techniques, we again conclude that no due process violation occurred. The Defendants displayed their interest in the two machine guns by their comments: They first indicated an intent to buy a machine gun in the future; they explained their need for one to help protect their drug enterprise; and Keith Cannon indicated he wanted to purchase a machine gun with a 50-round magazine at the next deal. In light of these comments, we do not believe the officers' conduct -- initially describing the machine guns and then noting the positive attributes of the guns -- is shocking or outrageous. The officers did not coerce or use hard-sell tactics to persuade Defendants to purchase a machine gun. The district court described the officers' effort as "soft-sell." (R. at 329.) Nor did the officers misrepresent the nature or the price of the machine guns or any of the other weapons. The officers simply kept the conversation going and responded to Keith Cannon's expressed concern about having enough fire power to adequately protect Defendants' drug business. The officers provided Defendants an opportunity to purchase a more powerful weapon. We do note the officers responded to Keith's indication that he would like to purchase a machine gun with a 50-round capacity at the next meeting by indicating that a machine gun may not be available then; however, in the context of the conversation, this conduct was not so outrageous that it violated Defendants' due process rights. It seems to us to be a technique commonly used by salespersons, viz., buy this product now before someone else does. Like the district court, we believe that if the defendants had decided not to buy a machine gun, the officers "would have politely acquiesced." (R. at 328.) Because "the mere sale by the government of contraband to one predisposed to buy it" does not amount to a due process

20

violation, <u>Dougherty</u>, 810 F.2d at 710, the conduct leading to the sale was not, in itself, outrageous.

If bringing the selection of firearms to the meeting and conducting themselves as the officers did do not violate the Defendants' due process rights, the question then becomes whether the difference in punishment between the consecutive penalty for using or carrying the handguns the Defendants did request (imprisonment for 5 years) and the heavier penalty for using or carrying the machine gun (imprisonment for 30 years) makes the officers' conduct outrageous. <u>See</u> 18 U.S.C. § 924(c)(1). Defendants argue that it does. They would have us decide this case using a sliding scale that measures the constitutionality of government conduct by the penalty Congress has deemed appropriate for a particular crime. We decline to do so. Our judicial role in analyzing the alleged outrageous government conduct is to measure the officers' actions against the constitutional limits of the Due Process Clause, not as the case plays out under the penalties prescribed by Congress.[3] Because the agents' conduct itself was not unconstitutional, we conclude that the district court properly refused to dismiss counts six and seven of the indictment on due process grounds.

G. JURY INSTRUCTIONS

   1. Jury Instruction No. 4: Entrapment

---

[3]We recently reiterated our discomfort with reverse-sting operations, which have great potential for abuse. <u>United States v. Stavig</u>, 80 F.3d 1241, 1247 (8th Cir. 1996). This troubling case is no exception. Drawing the line between constitutional, zealous law enforcement in the "war against crime" and outrageous, unconstitutional conduct that offends the fundamental fairness of our system is no easy task. Because of the great potential for abuse in these situations, we urge district courts to continue giving them the most careful scrutiny and probing examination. <u>Id.</u>

Defendants next argue that the district court erroneously submitted the issue of inducement to the jury in the jury instructions.[4]  Although a defendant who has produced evidence of inducement is entitled to jury instructions accurately stating as a whole the law of entrapment, the defendant has no right to particularly worded instructions.  United States v. Parker, 32 F.3d 395, 400 (8th Cir. 1994).  The jury instruction in this case, which was based on the Eighth Circuit Model Criminal Instruction No. 9.01, correctly states the law of our circuit.  United States v. Aikens, 64 F.3d 372, 375 (8th Cir. 1995), vacated and remanded for reconsideration in light of Bailey v. United States, 116 S. Ct 501 (1995), 116 S. Ct. 1364 (1995).  The instructions, when viewed as a whole, properly focus on the question of Defendants' predisposition and place the burden on the government to prove that element beyond a reasonable doubt.

2.  Jury Instruction No. 21:  Use of Firearm

Defendants also argue the district court erred in overruling their objections to Jury Instruction No. 21 concerning the charges under 18 U.S.C. § 924(c), which prohibits the using and carrying of a firearm during and in relation to a drug trafficking crime.  The

---

[4]Jury Instruction No. 4 reads as follows:

If either defendant did not have any previous intent or disposition to commit the crime charged, and was induced or persuaded by law enforcement officers or their agents to commit that crime, then that defendant was entrapped.  On the other hand, if a defendant did have a previous intention or disposition to commit the crime charged, then that defendant was not entrapped, even though law enforcement officers or other agents provided a favorable opportunity to commit the crime, or made committing the crime easier, or even participated in acts essential to the crime.

If a defendant was entrapped, he or she must be found not guilty.  The government has the burden of proving beyond a reasonable doubt that the defendant was not entrapped.

22

court correctly instructed the jury on the elements of the crime charged in count six (using and carrying firearms during and in relation to a drug trafficking crime) in Instruction No. 20. The jury was told that the crime had two elements: "One: that a defendant committed the crime of distribution of a controlled substance, as defined in these instructions, a drug trafficking crime; and Two: that a defendant knowingly used and carried firearms during and in relation to the commission of either of those crimes." The jury was further told that the government had to prove both elements beyond a reasonable doubt and also had to prove that a defendant was not entrapped. The court then defined for the jury in Instruction No. 21 one meaning for "use." Instruction No. 21 stated: "An individual who exchanges a controlled substance for a firearm `uses' the firearm during and in relation to a drug trafficking crime." Defendants challenge this instruction on two grounds.

First, Defendants contend that Instruction No. 21 improperly required the jury to find "use" if the jury found the parties had bartered drugs for firearms. To support their argument, Defendants rely on the Supreme Court's use of the word "may" in Smith v. United States, 508 U.S. 223 (1993). Defendants specifically quote from Smith: "[U]sing a firearm in a guns-for-drugs trade may constitute `us[ing] a firearm within the meaning of § 924(c)(1).'" Id. at 237 (emphasis added). Defendants contend this language means that not every trade of a gun for drugs or drugs for guns is necessarily a use of the firearm within the meaning of § 924(c), and the jury must decide whether or not "use" has occurred.

We believe the Defendants overlook the Supreme Court's holding in Smith: "We therefore hold that a criminal who trades his firearm for drugs `uses' it during and in relation to a drug trafficking offense within the meaning of § 924(c)(1)." Id. at 239. Furthermore, the Court recently revisited the issue of "use" under 18 U.S.C. 924(c) in Bailey v. United States, 116 S. Ct. 501

23

(1995), and stated that the barter of a gun for drugs is "use" within the meaning of § 924(c).  <u>Bailey</u>, 116 S. Ct. at 505.  After explaining that "use" requires some showing of active employment, the Court reiterated that this understanding of the term includes bartering a firearm.  <u>Id.</u> at 508. Defendants err in their analysis by failing to distinguish between a factual finding and a legal conclusion; the factual finding of whether a firearm became an item of barter in a particular drug transaction is a matter for the jury, but the effect of that finding is a legal question, one that <u>Smith</u> resolved.  According to the Court's explanation in <u>Bailey</u>, <u>Smith</u> stands for the legal proposition (not mere factual possibility) that bartering a firearm is "use" under § 924(c).

We note that this case differs from <u>Smith</u> in that <u>Smith</u> involved a defendant trading a gun for drugs, whereas Defendants in this case traded their drugs for guns.  We believe this is a distinction without a difference.  Section 924(c) prohibits using or carrying a firearm during and in relation to "a crime of drug trafficking."  Because selling cocaine base is as much a crime of drug trafficking as buying cocaine base, and "`use' certainly includes . . . bartering," <u>Bailey</u>, 116 S. Ct. at 508, we believe that § 924(c) and the <u>Smith</u> holding apply with equal force to the facts of this case.  The Defendants "used" the machine gun when they proposed to the agents that the Defendants' drugs be traded for the weapons, and then obtained the weapons in trade.

In <u>Smith</u>, the Supreme Court looked to § 924(d) to help define the scope of the term "uses" in § 924(c).  We do the same and note that one "uses" a firearm under § 924(d)(1) when one "receives" a firearm in violation of § 922(a)(3) (generally prohibiting the transport into or receipt of a firearm in the state of the person's residence if the firearm was obtained outside that state by an unlicensed person).  Hence, we are of the view that a person can "use" a firearm in violation of § 924(c) by "receiving" the firearm

24

in a drugs for weapon exchange as well as by tendering a weapon as one's consideration in a gun for drugs trade ala Smith.

In their second challenge to Jury Instruction No. 21, Defendants similarly contend that the instruction erroneously removed from the jury's consideration the "during and in relation to" element of § 924(c). Defendants correctly state that the government in this case had to prove not only the "use" element, but also the "during and in relation to . . . a crime of . . . drug trafficking" element. Smith, 508 U.S. 237-38. The "during and in relation to" element was element two of the district court's marshaling instruction No. 20. The Supreme Court held in Smith, however, that contemporaneous bartering of weapons and firearms is use during and in relation to the drug trafficking crime, because the firearms are traded during and are an integral part of the transaction. Id. at 238.

The district court here submitted to the jury the issue of whether the Defendants traded drugs for weapons and also instructed the jury on the legal effect, under Smith, if the jury found such a trade had taken place. Under these facts, we find no error in the district court's instruction concerning the elements of 18 U.S.C. § 924(c).

This case differs from United States v. Gaudin, 115 S. Ct. 2310 (1995), where an element of the crime itself was entirely withdrawn from the jury and decided by the court. Here, all the trial judge did was define the term "uses" to mean just what the Supreme Court said it meant, in much the same way the court defined terms for the jury like "machine gun," "possession," or "induced and persuaded." The jury still had the responsibility to decide whether or not each and all of the elements of the crime had been proven beyond a reasonable doubt. It still had to decide what actually happened in the motel room between the Defendants and the

25

officers, and whether or not either Defendant used a firearm in violation of the statute.

## H.  CONGRESS'S POWER UNDER COMMERCE CLAUSE

Defendants next argue that Congress exceeded its power under the Commerce Clause when it enacted 21 U.S.C. §§ 841 and 924(c). This argument is foreclosed by United States v. Brown, 72 F.3d 96, 96 (8th Cir. 1995), petition for cert. filed, (Mar. 27, 1996) (No. 95-8470).

We have considered Defendants' remaining arguments and find them to be either without merit or moot by the reversal.

### III.

We reverse the judgments of the district court because the prosecutor engaged in misconduct, depriving the Defendants of their right to a fair trial.  We remand the case for a new trial as to both Defendants in accordance with this opinion.

JOHN R. GIBSON, Circuit Judge, concurring in part and dissenting in part.

I concur in the holding that prosecutorial misconduct compels a new trial in this case.  I respectfully dissent from that part of the court's opinion regarding the "use" of firearms under 18 U.S.C. § 924(c) (1994).

The district court instructed the jury that "[a]n individual who exchanges a controlled substance for a firearm `uses' the firearm during and in relation to a drug trafficking offense."  I believe this materially misstates the law, and directs a verdict on the firearm charges.

26

The court today approves this instruction by expanding the Supreme Court's holdings in Smith v. United States, 508 U.S. 223 (1993), and Bailey v. United States, 116 S. Ct. 501 (1995), and neglecting the distinction between using a firearm to obtain drugs and using drugs to obtain a firearm. In its opinion, the court states that trading drugs for guns instead of trading guns for drugs, as was the case in Smith, amounts to a distinction without a difference. Slip op. at 24. The court concludes that the Cannons used the guns within the meaning of the statute "when they proposed to the agents that the Defendants' drugs be traded for the weapons, and then obtained the weapons in trade." Id. I believe this conclusion goes beyond the "`ordinary or natural' meaning" of the term "use" and allows for a conviction under section 924(c)(1) without "active employment of the firearm" by the defendant. Bailey, 116 S. Ct. at 506. Such a holding is prohibited by the Supreme Court's recent interpretation of the term "use" in section 924(c). Id.

Looking to Smith for guidance, the Supreme Court recently reiterated that "[t]he word `use' in the statute must be given its `ordinary or natural' meaning, a meaning variously defined as `[t]o convert to one's service,' `to employ,' `to avail oneself of,' and `to carry out a purpose or action by means of.'" Bailey, 116 S. Ct. at 506 (quoting Smith, 508 U.S. at 229 (citing Webster's New International Dictionary of English Language 2806 (2d ed. 1949) and Black's Law Dictionary 1541 (6th ed. 1990))). The central holding of Bailey, 116 S. Ct. at 506-509, is that the government must show active employment of the firearm so as to establish use under section 924(c). The Court stated that Smith faced the question of "whether the barter of a gun for drugs was a `use,' and concluded that it was." Bailey, 116 S. Ct. at 505. The Court then referred specifically to bartering "with a firearm," id. at 507, and "bartering" a firearm, id. at 508, which language denotes that the object bartered, and thus used, was the firearm.

27

Smith, 508 U.S. at 237, held that trading a firearm for drugs was using the firearm within the meaning of section 924(c). In drawing this conclusion, the Court turned to section 924(d) for assistance in interpreting section 924(c). Id. at 234-36. The Court noted that "one who transports, exports, sells, or trades a firearm `uses' it within the meaning of section 924(d)(1)--even though those actions do not involve using the firearm as a weapon." Id. at 235. Further, "using a firearm" must mean the same thing in both section 924(c)(1) and section 924(d). Id.

The court today relies on the fact that section 924(d) provides for forfeiture when "unlicensed receipt of a weapon from outside the State, in violation of section 922(a)(3)," occurs. In addition, forfeiture may also occur when one receives stolen firearms in violation of section 922(j). See Smith, 508 U.S. at 234 n.*. Certainly, one who receives an illegal firearm must forfeit that weapon under section 924(d). This, however, offers no support for concluding that a person receiving a firearm in exchange for drugs "used" the firearm within the meaning of section 924(c), so as to require a mandatory minimum sentence, here thirty years. This was not the question decided in Smith, and such a conclusion cannot withstand scrutiny in light of the Court's ruling in Bailey.

Smith, 508 U.S. at 234-35, examined all of section 924(d)[5] in deciding that transporting, exporting, selling, and trading were all "use" within the meaning of section 924(d)(1). This is consistent with Bailey, 116 S. Ct. at 506-07, as each of these activities involves the "active employment" of a firearm.

---

[5]Unlicensed receipt of weapons from outside the state and receipt of stolen firearms were only two of the numerous weapon offenses resulting in forfeiture and considered by the Court in Smith, 508 U.S. at 234 n.*.

*Bailey* constrains the holding in *Smith* and prohibits the broad interpretation used by the court today. *Smith* and *Bailey* can only be reconciled by limiting *Smith* to its express holding: When a person who has a firearm trades that firearm in exchange for drugs, that person has used the firearm to obtain drugs. The case simply cannot stand for the converse of this proposition.

The Cannons here possessed drugs that they traded for firearms. After receiving the firearms, they were promptly arrested leaving the motel with the firearms in hand. While the Cannons actively employed the drugs in order to obtain the firearms, there was no "evidence sufficient to show an active employment of the firearm by the defendant." *Bailey*, 116 S. Ct. at 506. Thus, the Cannons did not "use" the firearms within the meaning of section 924(c)(1),[6] and the district court erred in instructing the jury that exchanging a controlled substance for a firearm constituted "use" of a firearm.

I would reverse and remand on this issue as well.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[6]I also believe that it cannot be said that the Cannons used or carried the firearms "during and in relation to" a drug trafficking offense. I do not treat this issue in detail because the court's direction that a person exchanging drugs for a firearm uses it during and in relation to the drug trafficking offense essentially directs a verdict for the government, which is plainly error.

29